*52 OPINION of the Court, by
Judge Losan.
These are cross appeals from a decree ol the Madison circuit court.
Turner and others exhibited their bill as assignees of Higgason Grubbs, against Green Clay, to coerce the conveyance ot land upon a contract entered into between Grubbs and Clay on the 24th of February, 1787 ; and Clay exhibited his bill praying that the contract may be cancelled, because of the failure and inability on the part of Grubbs to perform the contract.
By the contract, Clay covenanted to make a good and lawful deed to Grubbs for a certain tract of land supposed to contain 1000 acres, and in the event of any pf the said tract being lost, that he would pay the re foe *53 at the rate of £40 per 100 acres ; and Grubbs cove-«anted on his part to assign to Clay, without recourse on him or his heirs, a bond on Lawrence Thompson and David Tanner for 900 acres of land ; and also a bond on Aquilla White for 4C0 acres, or one in lieu thereof, at the election of Clay, on Lawrence Thompson lor 500 acres of first rate land, lying on Licking, part of a bond for 2000 acres ; and to pay, moreover, to John Tanner £l00 for the benefit of
trail where part bas b^en Per' ¡°r”ot ⅛ ⅛ power of the court to rei.n* ftace the partie« UQ{efs fraUdor the afl of the pt*'
The court below dismissed Clay’s bill, and decreed him to convey on certain conditions the land specified in his obligation, from which both parties have appealed to this court. rjTi i . , . . . , , .
, ine complainants combine with their equity as assignees of Grubbs, the alleged assurances of Clay, both before and after their purchase, that he had received satisfaction from Grubbs, and was willing to convey the land as soon as he could procure his patent from the commonwealth. And they moreover state, that confiding in those representantions, they were induced to pay Grubbs the full amount of the purchase money ; and to settle on the land, and make lasting, valuable, and extensive improvements ; and are now apprehensive, from the declining circumstances of Grubbs, that he will be unable to pay them, if they fail against Clay. Clay denies all the material allegations, and from the proof in the cause it is rendered unnecessary to inquire into the legal effect of the alleged assurances of Clay, inasmuch as those allegations in the bill are not supported. The complainants, therefore, must rest their equity solely on the equity of Grubbs under his contract with Clay.
The application to a court of chancery to compel a\ specific execution of a contract, is an application to the S sound discretion of the court, regulated by certain es- : tablished rules in the effectuation of the fair and honest \ contracts of parties. But this power, courts of equity j have always refused to exercise in favor of one w-hd has ! failed or rendered himself unable in any essential part j to perform his contract, or who has trifled and shewn a ⅛ backwardness and unwillingness to do w'hat was incum- Í bent on him : for he who asks equity from another, must shew that he has done equity, or that he lias not by his own act placed it out of his power to render aquity.
*54 The contract on the part of Grubbs, in the transfer of a bond on Lawrence Thompson and David Tanner for 900 acres of land, and the payment of the 100/. for the benefit of Clay, seem pretty satisfactorily shown in the cause; but with respect to the residue of the contract, he has clearly failed.
Clay, it seems, elected to take a transfer of the 500 acres on Thompson, in preference to the 400 acres on Aquilla White ; but at what time he made his election to do so, does not appear. It becomes necessary, therefore, to examine how far Grubbs has performed or is able to perform this part of his contract. It is shown that Grubbs had been possessed of a bond on Lawrence Thompson for 2000 acres of first rate land on Licking, and on the 26th of April 1785, had transferred 1500 acres thereof to Samuel Estill, and on the 17th of May 1786, assigned over all his right in said bond to said Estill.
Upon this bond it seems that Estill had instituted suit against Thompson. It is however not improbable, from the answer of Grubbs and circumstances appearing in the cause, that Grubbs was entitled to 50Q acres, part of said bond. But Grubbs afterwards procured the said bond from Estill, and on the 26th of June 1790, acknowledged, by his endorsement on the bond, “ to have received full satisfaction of the within bond for value received, and to have no farther demand against the obligor.”
From the exhibits in the cause it appears that Robert Craddock, who had purchased out Lawrence Thompson’s interest in certain lands, had covenanted in June 1787, to convey to Grubbs, his heirs, &c. as much of said land as should be of equal value to the bond for 2000 acres, provided Grubbs should produce the said bond on Thompson, and give such receipt thereon as would enable Craddock to obtain a c'redit therefor from Thompson.
Grubbs in his answer states that he was induced to purchase the benefit of the bond on Thompson back from Estill, in order to secure himself from his responsibility to Estill in the event of Thompson proving unable to pay it, and for the purpose of endeavoring to secure the residue through Craddock, This, from the evidence in the cause, is believed to have been the fact, *55 Bat the bond thus obtained from Craddock, Grubbs assigned over 1500 acres thereof to Ralph Morgan, without recourse, on the 29th of December 1787, who, on the 21st of June 1790, assigned said bond to Morris Nagle.
It has already been observed that it does not appear at what time Clay made choice of the 500 acres on Thompson. But from the foregoing statement of facts it seems that in all probability Grubbs could not at any time, after Clay had elected to take the assignment of the bond on Thompson, have made the assignment for want of the bond. But be this as it may, it is proven in the cause that Clay offered to take Craddock’s bond, supposing that the receipt against Thompson’s rendered it of no value. Grubbs was willing to secure him the value of such bond on Thompson, and has taken much proof to shew the insolvency or doubtful circumstances of Thompson, at and since the time of the contract.
From these facts it appears that Grubbs has not been able, according to his contract with Clay, to assign to him a bond on Thompson, agreeable to their contract. He seems in fact to have held no writing on Thompson since the year 1790: and if he were to rely on having divested himself of the bond before Clay made his election to take that bond, but in effect and evidently for the safety and benefit of the holder of the bond, then the transfer to Morgan of the writing which evidenced his right to the remaining 500 acres on Craddock, prevented him from assigning the bond for that quantity to Clay. And surely Clay was not bound to receive a separate writing for the benefit of the 500 acres, either on Thompson or Craddock. But even the writing on Craddock for the 500 acres, Grubbs does not seem to have been willing to give up, from the evidence of Jesse Em-bry.
Under these circumstances, it would be doing more than a court of chancery perhaps ever did towards coercing specific executions of contracts, for this court t« decree a conveyance from the defendant. If a complainant, tobe entitled to a specific performance, ought to shew that he has either performed, or is ready to perform his part of the contract, then in the present case he must fail, and rest upon legal principles only *56 to afford relief. The purchasers under him stand upon his equity and must share his fate.
We come now to consider the ground set forth by Clay for vacating the contract.
A court of equity ought not to rescind a contract where it is not in the power of the court to reinstate the parties, unless fraud or the act of the party himself shall have prevented it.
The contract in the present case has been in a considerable part carried into effect. It is not material, under the terms of the contract, whether the 900 acres of land has been obtained or not. The complainant agreed to take that bond without recourse to, or responsibility on the part of the defendant for its recovery ; and therefore, to justify a rescisión of the contract, the complainant should Dot only pay the ^100 with interest, but also the value of the 900 acres of land. For having risked the procurement of this land, and lain by for a considerable time, without endeavoring to secure the value thereof by all legal means in his power, and then seek to be relieved from the loss, by a vacation of the contract for a partial failure on the part of the defendant, would afford him on the one hand the benefit of gain, if fortunate in the procurement of the 900 acres ; and on the other hand, protect him from its loss. This would destroy that mutuality of loss and gain, which arose between the parties under the terms of their contract, by leaving one the benefit of a risking bargain if he chose, or redeeming him at pleasure from its loss. This, a court of equity will not do,unless tru¿ ly gross fraud and injustice had been practised by one ef the parties. But this not being the case, we are of opinion that a court of chancery should not interpose between the parties.* either for the purpose of can-celling the contract, or compelling its specific execution.
Wherefore, it is decreed and ordered* that the decree of the circuit court for a specific execution of the contract, be reversed and set aside ; and that the decree of said court dismissing the bill praying for the vacation of the contract, be affirmed ; and that the suit be remanded to that court, in order that the decree of said court dismissing the bill of the appellees may be rendered.